I8DHJohS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          17 Cr. 482 (JSR)

5   PETER G. JOHNSON,

6                                          Sentence
                        Defendant.
7   ------------------------------x

8
                                           New York, N.Y.
9                                          August 13, 2018
                                           2:23 p.m.
10

11  Before:

12                   HON. JED S. RAKOFF,

13                                         District Judge

14                        APPEARANCES

15  GEOFFREY S. BERMAN
         United States Attorney for the
16       Southern District of New York
    BENET KEARNEY
17       Assistant United States Attorney

18  ISABELLE A. KIRSHNER
    WAYNE GOSNELL
19       Attorneys for Defendant

20  ALSO PRESENT:   BRANDON RACZ, Special Agent FBI

21

22

23

24

25

I8DHJohS

1                (Case called)

2                MS. KEARNEY:  Good afternoon.  Benet Kearney and

3       Daniel Tracer, for the United States.  With us at counsel table

4       is Special Agent Brandon Racz of the FBI.

5                THE COURT:  Good afternoon.

6                MS. KIRSHNER:  Good afternoon.  Isabelle Kirshner and

7       Wayne Gosnell with Mr. Johnson, who is seated between us.

8                THE COURT:  Good afternoon.

9                We're here for sentence.  The guideline range as

10      calculated by the probation office is a total offense level of

11      36, a criminal history category of I, and a guideline range

12      therefore of 188 to 235 months.

13               Is there any disagreement with that?

14               MS. KEARNEY:  Not from the government.

15               MS. KIRSHNER:  No, your Honor.

16               THE COURT:  Very good.  The Court adopts that as well.

17      Needless to say, no one here, including the Court, thinks

18      that's an appropriate sentence.  The recommendation of

19      probation is 60 months, five years.  I was very impressed with

20      both the defense submission and the government submission, and

21      I was really impressed that the government did not, as it has

22      sometimes in the past, tried to tie itself to the guidelines,

23      and that was much appreciated.  It made the memorandum much

24      more forceful in my view.

25               Let me hear now from defense counsel, then from

I8DHJohS

| | |
|---|---|
| 1 | government counsel, and then from the defendant if he wishes to |
| 2 | be heard. |
| 3 | MS. KIRSHNER:  Thank you, your Honor. |
| 4 | This is, obviously, a very important and very |
| 5 | stressful day for Mr. Johnson and his family.  He is very |
| 6 | fortunate to have the support of a very loving and extended |
| 7 | family, all of whom are seated behind me.  His wife, his |
| 8 | children, and his extended family are here.  They are, |
| 9 | obviously, waiting anxiously for your pronouncement of the |
| 10 | sentence here. |
| 11 | Very briefly I'm going to talk about the facts a |
| 12 | little bit, and that is that, first and foremost, Mr. Johnson |
| 13 | accepts full responsibility for his actions.  I don't want to |
| 14 | reiterate what's in our submission.  I'm pretty confident your |
| 15 | Honor's read all that quite carefully, but there are certain |
| 16 | aspects -- |
| 17 | THE COURT:  Including the very fine letters that you |
| 18 | attached, all of which were very important to the Court. |
| 19 | MS. KIRSHNER:  Thank you. |
| 20 | I think there are certain aspects of the facts that |
| 21 | are important to the Court's determination.  Most important, I |
| 22 | think, is that this did not start out as a criminal scheme. |
| 23 | Nobody got up in the morning and said, Gee, let's commit a |
| 24 | fraud today.  This was an ongoing business that Pete and his |
| 25 | family had built over many years.  He brought his family into |

I8DHJohS

1    the business with the hope that it would provide for them in

2    the future.  As noted in the presentence report and in the

3    government's submission, he's responsible mostly because he was

4    the boss and not because this was his idea or because he

5    directed people to do something or not do something.

6         THE COURT:  Let me interrupt you at that point because

7    this is a question I had for the government, but maybe before

8    you continue we should hear the answer to this question.

9         The government correctly describes this defendant as

10   "a leader," but what is the government's view as to whose idea

11   this was and who was the prime mover, if anyone?

12        MS. KEARNEY:  I think in our conception of this, your

13   Honor, there are two different ways that people are leaders

14   here.  One is this defendant, Peter G. Johnson, who was in

15   reality the leader of this company, right?  He was the CEO.  He

16   was the one with the ultimate say-so.  He had the power to stop

17   the fraud.  His condonement of the fraud is what led to it

18   continuing.  He had full knowledge and approval of the fraud.

19   That's separate from who was the mastermind of said fraud.  In

20   our assessment, that's Peter B.  He was the one who had the

21   ideas, who came up with the various ways to manipulate these

22   reports so that they would seem plausible but would achieve the

23   goals of representing sufficient collateral for the loans.

24        THE COURT:  That was my take on it as well, but I

25   wanted to hear the government's view.  I assume defense counsel

I8DHJohS

1    agrees with that, but let me hear from defense counsel.

2              MS. KIRSHNER:  I think that it is -- we agree that at

3    some point us our client, Peter G. Johnson, became aware of it,

4    had the obligation to stop it, and did not do that; but it was

5    certainly not his brainchild by any stretch of the imagination.

6              What's different from this case than many other cases

7    is what we don't see here is personal enrichment.  Other than

8    him deriving his salary from the company for the job that he

9    performed, we don't have the yacht; we don't have fancy cars;

10   we don't have the mansion; we don't have the ostrich jacket.

11   We have people who were working.

12             THE COURT:  No, I think that's fair, but it's not

13   exactly that he was living on welfare either.

14             MS. KIRSHNER:  No, he was earning a living, and a good

15   living, from running a company that was a growing company.

16             THE COURT:  The thing you need to focus on, if I may,

17   because it's the biggest argument against the very valid points

18   you're in the process of making, is just the huge size of the

19   loss.

20             MS. KIRSHNER:  Well, it is a huge loss, and it's a

21   huge loss because it was a big business.  And it's a huge loss

22   because a big business required lots of money to keep it

23   growing.  I think the most important thing in dealing with that

24   is that we have a case here where there's actual loss and

25   obviously a big loss, but the intended loss was virtually zero.

I8DHJohS

```
1   Everybody -- certainly Peter never intended for there to be a
2   loss here.  It was always the intent and the hope that this
3   infusion of funds would keep this business going and that the
4   orders and the contracts could be filled and that banks could
5   be paid back, and instead, there was an overexpansion and poor
6   decision-making and failure to respond to economic crises.  And
7   crimes were essentially committed to keep the sinking ship
8   afloat.  Yes, so it's a big loss, but the intention was zero.
9   I think that's very, very important here.
10          THE COURT:  It's certainly important, but of course --
11  and I don't say this as anything other than the extreme
12  comparison -- the same could be said of many people who run
13  Ponzi schemes, that they ultimately hope that everything will
14  turn around and it will all work out, and so forth.
15          MS. KIRSHNER:  But there you have a situation --
16          THE COURT:  That's a distinguishable situation.  I
17  mention that only as an extreme.  But a person with this
18  defendant's background and knowledge had to know at some point
19  that the probability that it would all turn out right were low,
20  yes?
21          MS. KIRSHNER:  I think a person with this background
22  and experience would have known that.  I also think a person
23  with failing executive functions was not able to respond as
24  quickly to the issues and as appropriately to the issues as he
25  might have under other circumstances.
```

I8DHJohS

1          THE COURT:  All right.

2          MS. KIRSHNER:  What we do have here is clearly a full

3     and full-throated acceptance of responsibility, and that's not

4     only demonstrated by the numbers of letters that your Honor had

5     written and the expressions of responsibility, it is noted in

6     the presentence report and also by the payment of almost the

7     entire forfeiture amount already.  As noted, there is $230,000

8     outstanding.  Those funds are in an attorney escrow account

9     waiting to be paid to the government.  Since those funds

10    represent his share in a home that has been used to secure the

11    bond, we thought it appropriate to wait until the bond was

12    exonerated before that transfer took place.  So as soon as that

13    transfer takes place, he will pay off the forfeiture.  As you

14    know, there's this parallel civil proceeding, and his wife's

15    lawyer in that proceeding is holding the funds.

16          I want to talk a little bit about Mr. Johnson's

17    personal background.  Clearly, he was a man who prior to this

18    event has been greatly respected not only by his family members

19    but by his community and a very large circle of friends.  It

20    would be wrong to simply disregard the first 65 years of a

21    person's life where he continually gave of himself and lived

22    his life as a great citizen and acted in a way that I think we

23    wish all of our citizens would act.

24          I know we have submitted a number of letters on his

25    behalf.  Your Honor has indicated you've read them.  While

I8DHJohS

they're all very effusive in their praise of Pete, they're also

very unique, each one of them, in terms of what his impact was

on each one of these people.  They describe a man who has

always been, who's always been present, and they describe a man

who's been like that over a course of decades.  This wasn't the

last couple of months in anticipation of today's proceeding.

The universal theme in these letters is that before

you is a man whose good deeds are unknown to others.  He's a

person who does good things for people without any thought of

obtaining anything in return, and he's been doing that for

years.  I don't need to go through each and every one of the

letters, but I'd like to point out some of them, I guess,

chronologically almost.

If we look at tab 30, there's a letter.

THE COURT:  Yes, let me.  My law clerk needs to hand

that up to me.  Thank you.

MS. KIRSHNER:  If you look at tab 30, there's a letter

from a Kenneth Marcus.  He was a fraternity brother of Pete's

back in the '60s at Penn State when Pete took a stand about

what was right at a fraternity in Pennsylvania when he insisted

that a Jewish pledge be allowed into this fraternity that had

before that been restricted.

Tab 17 is a letter from the Worthingtons who only

heard about acts of kindness from third parties and years

afterwards.  And they talk about a couple that was an immigrant

I8DHJohS

1    couple that had no place to stay, and years later they told the

2    Worthingtons of Pete having taken them in and put them up while

3    they were in the United States.  I think the letters from the

4    family, particularly at tab 7 and 8 are Pete's sister and her

5    brother-in-law, describe the extraordinary care that he

6    provided to his failing parents and the tender and

7    unconditional love that he gave them.  Francis Keneally

8    described Pete's care of Francis' children when he was facing a

9    very, very serious condition.

10        Tab 11 talks about Pete's care of his cousin Martha

11    who's a quadriplegic and Pete's insistence that she be -- that

12    she attend every one of the family functions because that was

13    likely one of the few joyous moments in her life, and how he

14    would go out of his way to make sure that she got there.

15        Then we have at tabs 26 and '7 letters from

16    Mr. Pierson and Mr. Harris describing Pete's extensive

17    community service: allowing kids to use his pool, starting up a

18    Boy Scout troop, and really living the life of a good and

19    productive citizen.

20        Finally, Judge, I want to come to what's probably the

21    hardest thing to talk about today, and that's Pete's medical

22    condition.  I think it's been really hard for him.  I think

23    it's really hard for his family to come to grips with the words

24    that are written in Dr. Benson's report.  Generally, there's

25    been denial in a lot of different corners here about how adult

I8DHJohS

1    he is.  Any lawyer who represented Pete before I did was very

2    right to send him for tests.  I've only known him for eight

3    months.  I can tell you what I've seen in the eight months in

4    terms of deterioration, but he's going to get up and talk to

5    you in a couple minutes, and he's going to sound fine.  And

6    you're going to look at him and you're going to say:  I think

7    that guy's all right.  But I will tell you that if you spend

8    any significant amount of time with him, you note something's

9    not right.  He's smart and he's articulate, but something's

10   just not right.

11        I'm sure you've read the report that's at tab 45.  To

12   us, I mean, one of the most compelling aspects is the imaging

13   that was contained on page 13 there with the blue figures and

14   the white figures in the upper image that really just

15   demonstrate the extent of the injury.  As we noted, Dr. Benson,

16   who's reviewed the brain scans of about 150 NFL players, told

17   us that Pete has the brain of a man who's played professional

18   football for ten years.  That each one of these violent hits,

19   each one of these violent confrontations is magnified many,

20   many times for the nonviolent ones.  That the brain itself

21   becomes more and more susceptible to injury every time one of

22   these violent confrontations takes place.

23        Dr. Benson described to us that his executive function

24   is impaired, and we asked him to explain that to us.  He said

25   his ability for reasoning, deliberation, judgment, and adaptive

I8DHJohS

1   decision-making were significantly compromised.  So you asked

2   before about a man of his experience and his sophistication,

3   yeah, I think that's true, but that doesn't take into account

4   the man who's sitting here next to me today.

5            Again, we're not asserting these as a defense to the

6   crime, but it clearly puts into context how Pete ended up

7   before this Court.  Clearly, he slowly and without awareness

8   lost the skills that were required to deal with the

9   circumstances in which he found this business.  Then you

10  combine Dr. Benson's report with Dr. Bell's report, and

11  Dr. Bell had sort of the benefit of seeing Pete through the arc

12  of his adulthood.  He knew his parents.  He knew his kids.  He

13  knows him.  And his report is startling.  And he has sort of

14  the benefit of the before and after.  His description of Pete's

15  affect -- repetitive questioning, diminished facial

16  expressions, and that oh-so-telling dramatic weight loss --

17  really puts in perspective what we're dealing with here, and

18  that is a man who is in the beginnings of early onset of

19  dementia.

20           Then I look at his daughter's letter at tab 3, and

21  it's a really heartbreaking recognition that her father is not

22  the man that he was.  And she uses these really compelling

23  examples of confusing words like "chicken" and "teeth" or

24  forgetting to let the dogs back in and the repetitive comments.

25  I can tell you as the daughter of someone who died recently and

I8DHJohS

1    had suffered from dementia for the last year that denial's not

2    uncommon, particularly if you see people frequently and it's a

3    slow and steady slide.  You're just not going to pick it up.

4    So we're looking at a man whose future is bleak.

5           Your Honor, I know that for you and for many judges

6    and most judges that this is the hardest part of your job, and

7    I know that you take this part of your job very seriously.

8    We've both been at this for a long time, and we know that there

9    are good people who do bad things and there are bad people who

10   do bad things, and I think it's clear that we have to treat

11   those kind of people differently.  This is a very good person

12   who mostly watched as other people did bad things and didn't

13   step in to stop them.  He did not act appropriately as the

14   captain of the sinking ship.

15          His life as he knew it is over.  His family has been

16   torn apart.  All he has worked for, all he built, is destroyed.

17   Particularly he's a man who really loves his wife and wanted

18   more than anything for her to be secure as they grew older.

19   Instead, they're financially and emotionally ruined.  I don't

20   say this often, but I am pretty more than confident this man

21   will never offend again.

22          I ask that this Court fashion a sentence that is just

23   and merciful and appropriate for this man, and that's one that

24   has the least amount of impact and the lowest possible sentence

25   that your Honor can see his way to impose.  Thank you.

I8DHJohS

1          THE COURT:  Thank you very much.

2          Let me hear from the government.

3          MS. KEARNEY:  Thank you, your Honor.

4          A significant term of incarceration here, not one

5     within the calculated guidelines range by any means, though, is

6     appropriate.  It's appropriate because of the seriousness of

7     the offense, its nature and scope, and to provide general

8     deterrence.  I don't think we're making a significant

9     particular deterrence argument here, but general deterrence is

10    of great concern, particularly given the vastness of the

11    offense that we have here.

12         THE COURT:  Here's my question about that.  Of course,

13    I have to consider not only general deterrence and specific

14    deterrence and various other factors but also just punishment,

15    which is a more nebulous phrase, but I think it attempts to

16    capture just the overall nature of the crime itself.  But on

17    the question of general deterrence, all the studies that I've

18    seen indicate that in a white-collar situation like this,

19    prison time has substantial general deterrent effect, but the

20    amount of prison time means very little.  We go back to even

21    more basics.

22         Of all the factors that bear on deterrence, numerous

23    studies, now some of them over a century old, indicate that the

24    single biggest factor is the certainty of getting caught, but

25    the second biggest factor is prison time.  But the same studies

I8DHJohS

1    that show that, show that in the case of white-collar offenses,

2    prison time is particularly important as a general deterrent.

3    Don't indicate, other than at the extremes, much in the way of

4    hard data to judge additional deterrence.  So, for example,

5    yes, a sentence of a few weeks becomes in this kind of a

6    situation almost laughable.  It becomes the proverbial slap on

7    the wrist.  It has, if anything, no deterrent effect; maybe the

8    opposite.  A sentence of, God forbid, capital punishment has

9    significant deterrent effect well beyond the immediacy of the

10   fact of a punishment period, but no one would remotely suggest

11   that we should go to those lengths.

12          But when we're talking about the difference between

13   one, two, three, four, five years, that kind of analysis, what

14   is it that the government can point to that suggests that any

15   given one of those figures has a material general deterrent

16   effect greater than any of the other figures in the

17   white-collar context?

18          MS. KEARNEY:  I think the prison/not prison binary is

19   particular important.  And I know that your Honor credits it

20   significantly, but I think the sentencing factors also direct

21   your Honor to consider just punishment.

22          THE COURT:  Well, just punishment is, I think in my

23   view, where a major question of this sentence comes.  I think

24   Ms. Kirshner has laid out, both in her written submissions and

25   in her very fine oral presentation, the numerous reasons why

I8DHJohS

1    one would be sympathetic to this defendant, and they are not

2    lost on the Court.  Then we come back to the fact of a

3    $359 million loss.  This is money stolen in every real sense.

4    That's a huge amount.  So that bears on just punishment, but

5    I'm not sure it bears on general deterrence is my point.

6        MS. KEARNEY:  Well, I think, your Honor, when you're

7    dealing with spectrums of loss, and perhaps at either end of

8    the spectrum, as with many things, this doesn't apply, but the

9    greater the reward, the greater the risk.  Therefore --

10       THE COURT:  That is the going theory, but I think it's

11   not borne out by any of the studies, and I don't think it's

12   borne out by -- even in the more general field of economics

13   it's now largely under attack as so-called psychological

14   economists are casting great doubt on the economic man model

15   that used to be the going thing, so to speak.

16       Why do white-collar defendants commit crimes?  I don't

17   think there's any really good analysis of that.  I know there's

18   some books that have been written about it.  Some do it out of

19   greed.  A lot do it out of power.  Some do it because they're

20   feeling they have to justify their company or their position or

21   to cover mistakes that others have made or they have made.  One

22   can go on endlessly.  Each of those has to be looked at

23   individually, but none of them, I think, suggests that when one

24   decides to commit a white-collar crime, that they sit down and

25   they do a calculation:  Now, let me see.  I've got a 20 percent

I8DHJohS

1    chance of being caught.  If I am caught, the average sentence

2    for my kind of crime will be ten years.  On the other hand, I

3    plan to make a million bucks out of this crime, and then they

4    do an analysis of risk and reward.  Doesn't happen.  To be

5    frank about it, in the seven years I was a federal prosecutor

6    and the 15 years I was a white-collar criminal defense lawyer,

7    that almost never -- I think I never, ever met a defendant who

8    made that kind of calculation.  That's not how it happens.

9          Now, is there some general recognition of "I better

10   not do this because I run some risk of going to prison"?  Yes,

11   that the studies support, but that's as far as I think it goes.

12         MS. KEARNEY:  I agree with your Honor, there's no

13   mathematical calculation, at least with respect to most people

14   that goes into the decision to commit a crime, but I think

15   there is a gut calculation that happens here.  There's a gut

16   calculation of what do I stand to lose and what do I stand to

17   gain and what are the chances of either happening?

18         THE COURT:  I'm not sure I'm convinced of that.  I

19   will say this, though:  General deterrence in some sense is

20   relevant here, as I've already said.  Certainly, there's no

21   question that some prison time of a meaningful sort has a

22   deterrent effect, and a lot of studies show that especially in

23   the white-collar context.

24         General deterrence is relevant for one other reason,

25   which is it's a factor that exists regardless of how

I8DHJohS

sympathetic the defendant is.  It has nothing to do with the

defendant in more than an indirect way.  It has to do with

deterring others, who will often be much less sympathetic than

this defendant, from committing serious crimes.  So to that

extent it supports the government's view, but I'm still

skeptical as to how it translates into a specific sentence.

Anything further you wanted to say?

MS. KEARNEY:  Yes, your Honor.  Putting aside the

question of general deterrence, I think the nature of the

offense here warrants a significant sentence.  And that, as I

said before, is because of its scope and its volume.  This

scheme was perpetuated over years.  I recall your Honor noting

my use of the word "iterative" at one of my proceedings, and

it's just that.  It compounds itself.  This requires fictitious

entry after fictitious entry such that the next time you have

to submit one of these reports, you have to reaffirm all the

prior fraud and you have to commit new fraud.  So this is a

process that --

THE COURT:  It seems notwithstanding the -- this

defendant's declining mental faculties, it would be almost

impossible for someone who is exercising daily activity that he

was exercising, both physically and mentally, not to realize

how blatant this fraud had become, and yet he continued to

assist it.

MS. KEARNEY:  Yes.  So the defendant was well aware of

I8DHJohS

the scope of the fraud.  There are numerous emails where he

notes the size of the hole, as they called it, at Transmar and

discussed various ways of dealing with that in submitting these

reports.  But basically, the scheme requires them to double

down every time they submit a new report, and so this wasn't a

momentary lapse in judgment.  This wasn't a slip of a keyboard.

This was something that required reaffirmation every time these

reports were submitted.

          I don't think it's insignificant that the sums of

money involved here are huge.  Depending on the time period,

Transmar had available to it between 250 and $400 million.  So

once they could no longer perpetuate this fraud, once they

couldn't keep it going anymore, that's what the banks lost.

They had extended nearly $360 million in credit.  So the

argument that the intended loss is what should matter here,

that the defendant never intended for anyone to lose money

rings hollow because he knew the size of the hole, he knew the

risks that the banks were taking in extending this credit, and

they knew it was a very real possibility that this company

would never be able to pay it back.  When that falls apart,

it's the banks who are left holding the bag, and it's the banks

who are out hundreds of millions of dollars.

          The other thing that contributes to the seriousness of

this offense is the brazenness with which it was executed.

These were things that were discussed openly in email.  These

I8DHJohS

were things that were discussed at meetings amongst Transmar
employees.  This became the culture of the office.  This is
something that employees spent a large portion of their time
keeping up these appearances to keep this company going.  So by
the end, this company itself was a sham.

        We've already discussed the defendant's leadership
role in this.  This was his company.  He had the power to set
that tone, set that culture, and he had the power to pull the
plug on this but he didn't, and that's just to keep the company
afloat.  So serious crimes, your Honor, have to have serious
consequences.  Again, a significant term of imprisonment, not
nearly the guidelines range here, we think is appropriate.

        The last factor here is the need to avoid unwarranted
sentencing disparities.  Now, fraud cases have a myriad of
methods, and it's hard to find offenses that are exactly the
same.  It's hard to find defendants who are similarly situated.
We did provide your Honor with one example recently in front of
Judge Kaplan, the Cohen case which involved a smaller fraud in
terms of money, a larger fraud in terms of time, but the
various players, I think, are similarly situated to the
defendants we have here.  We have a CEO, a CFO, an accountant
who were submitting false borrowing-based reports, inflating
their sales numbers, and caused the bank to extend a loan of
about 4.8 million and were not able to recover that loan.  Just
wanted to offer that as a data point here for your Honor.

I8DHJohS

1          THE COURT:  I thought that was useful.

2          MS. KEARNEY:  Unless your Honor has any more

3     questions.

4          THE COURT:  No.  Thank you very much.

5          MS. KEARNEY:  Thank you.

6          THE COURT:  Before I hear from the defendant, anything

7     further that the defense counsel would like to say?

8          MS. KIRSHNER:  No, your Honor.

9          THE COURT:  Let me hear from the defendant if he

10    wishes to be heard.

11          THE DEFENDANT:  Dear Judge Rakoff, I guess the day of

12    reckoning has arrived.  In some ways this is ironic relief, as

13    the passage of time has only magnified the stress and

14    heartbreak of this disaster for my family's future.  There's

15    not a waking moment that this does not prey on my mind as the

16    feelings of disgrace and isolation from normality hang over and

17    are present over me.

18          First, I'd like to express my deepest regrets and

19    remorse for the ABM Bank-led syndicate which risked their trust

20    in Transmar to manage their interest.  My biggest regret is I

21    did not comprehend the situation fully and react early and

22    often to cure the growing borrowing-based issue created by our

23    exponential commercial growth.  In reflection I cannot fathom

24    why we did not communicate earlier to the bank group to find a

25    permanent solution.  Rather, we chose the fatal path of kicking

I8DHJohS

1   the can down the road.  I will be eternally plagued by the

2   realization that this disaster was fully avoidable.  Our lead

3   bank account executives were good people and deserved better

4   from me.

5        I also owe a huge gratitude, at the same time deepest

6   apologies to my loyal customers, suppliers, and employees.

7   Many of these relationships were acquired over years, if not

8   decades.  I deeply regret the resulting upheavals at their

9   expense.  I very much miss the personal interactions I enjoyed

10  for so many years with these fine people.

11       I'm also blessed to have earned many good friends from

12  grammar school through adulthood -- through adulthood, some of

13  whom traveled here today.  Their support has proven steadfast,

14  be it sending support letters, making phone calls, or traveling

15  long distance to visit me over the last months.  I cannot relay

16  how their love has bolstered my family's morale during this

17  very difficult time.

18       Likewise, I owe much gratitude to my extended family.

19  While they are dismayed, bewildered, and disappointed, they

20  have remained loyal and true.  My sisters and their husbands

21  have risked their homes and savings putting up bail for my son

22  Peter and for me, and they continue to provide constant support

23  and comfort.

24       I cannot overstate my enduring love, respect for my

25  wife Mary, beloved wife of 46 years.  She has not once wavered

I8DHJohS

in the face of adversity and our severely diminished future.
She deserves much better.  Deeply sad that I have derailed her
hopes, her well-earned retirement, and the financial perils she
now faces.  She is my life partner and pillar on which the
family leans.  I cannot really contemplate our pending
separation without breaking down.

        For Mary and my children who were involved in the
business in various degrees, this is nothing short of an
unmitigated disaster.  It has been prison without bars.  While
soothed by the support of friends and extended family, we are
in a free fall with no bottom in sight.  Our once close-knit
loving family bonds are broken, and the proud Johnson name has
been permanently shamed.  The scarlet letter will follow my
sons for the rest of their lives and impact their ability to
earn a living.

        My children and grandchildren have -- futures have
been turned upside down.  This is especially so for my oldest
son Peter B.  Four weeks from now he will stand before you.  I
very respectfully beg your consideration to levy some kind of
alternative sentence that would allow him to provide for and
not be absent from his family and society at large.  His
children are at very critical ages, eight, seven, and four, and
will be psychologically vulnerable to losing their father
during these key developmental years.  His wife Nicole is
superlative in every way and will have difficulty supporting

I8DHJohS

1     their family as a single parent.

2             Peter himself has certainly been reborn.  He is now

3     the father, son, and husband anyone could hope for.  He dug

4     himself out of drug and alcohol addiction and is a daily

5     participant at AA.  He's a little league baseball coach.  He's

6     a Cub Scout leader.  He's an active member in our church.  He

7     also volunteers in his neighborhood association.  Please,

8     please consider if there's some path through court-approved

9     program that would qualify as time served.  Peter's focus was

10    the German company, not Euromar, not Transmar, and his

11    responses were only an effort to help his dad.  I was the CEO

12    of Transmar.  Please let me take the brunt of this and serve

13    his time.

14            For me, my lifetime of work is wiped away.  Collateral

15    damage to my family, on top of this I received a frightening

16    medical diagnosis.  I can only hope to spend my remaining lucid

17    years with my one and only Mary.  I will rest with the truth

18    that the Johnsons never intended any loss to the banks nor

19    profited by self-enrichment.  My stupid and ill-advised

20    decisions make during historic and tumultuous market conditions

21    will sweep away a lifetime of hard work and aspirations of my

22    children and grandchildren.

23            I beg for leniency that could provide a better outcome

24    and allow Peter to contribute, to provide for his family's

25    livelihood, and to contribute to society at large.

I8DHJohS

1          Thank you.

2          THE COURT:  Thank you very much.

3          As one would expect, there's a lot of truth in both

4     what the defense counsel said and what the government counsel

5     said.  I agree with defense counsel that this is a good man who

6     did a bad thing.  I agree with government counsel that by the

7     end it had become a huge and brazen fraud.

8          It's interesting and somewhat depressing to see how

9     the law in general tries to deal with that.  The guidelines

10    would have me send Mr. Johnson to prison for 19 years or so

11    because they look at the harm to society and they view that

12    harm mostly in terms of economic terms.  They are oblivious to

13    all the other factors that, in my view, a civilized society

14    wants to have its judges take account of in sentencing.

15         On the other hand, the probation office, which is much

16    more sensitive to the multiplicity of factors involved in a

17    case like this, still recommends a sentence of five years based

18    on their experience, their comparison of other cases, and a

19    whole group of factors of which they have considerable

20    expertise.  There's no doubt in my mind that some prison time

21    needs to be imposed here because of both the enormity of the

22    offense and what we do know, which is not much but it's not

23    zero, about general deterrence.  Both suggest, if not demand,

24    that a crime of this magnitude be visited with the punishment

25    of prison.

I8DHJohS

1          On the other hand, if ever there was a moment when a

2    defendant's whole life, all the good things that Mr. Johnson

3    has done, all the positive ways in which he has conducted

4    himself as a family man, a community man, a businessman, and a

5    good citizen should have an impact on the Court, it is the

6    moment of sentence.  And I think I weigh those factors in this

7    and every other case very heavily.

8          So I think even the sentence suggested by the

9    probation office of five years, while a huge reduction from the

10   guideline sentence of 19 or so years, is still too high.  But I

11   don't want to be misunderstood.  There must be serious prison

12   time for this offense.  It is just too huge not to be responded

13   to.  And when the defendant says he did not intend a loss, as

14   his counsel also says, I accept that but also qualify it with

15   the notion that that was just blinding oneself to the reality

16   of the situation, because this did not occur on one day or one

17   week or one month.  It occurred again and again and, as the

18   government points out, was constantly not only reinforced but

19   made, if anything, more brazen.

20         So weighing all those factors, the sentence of the

21   Court is that the defendant is sentenced to 36 months in

22   prison, to be followed by -- the probation office recommends

23   five years of supervised release.  I don't understand that at

24   all.  I think two years of supervised release is more than

25   sufficient, so two years of supervised release.

I8DHJohS

1          Now, where do we stand on restitution?

2          MS. KEARNEY:  I have a proposed order for your Honor.

3          THE COURT:  All right.  If you would hand that up.

4          MS. KEARNEY:  As noted in our submission, we included

5   the most recent loss figures, taking into account the property

6   the trustee has been able to recover.

7          THE COURT:  All right.  There is also a special

8   assessment of $100 that must be paid.

9          All right.  This looks fine.  I take it there's no

10  objection to this order?

11          MS. KIRSHNER:  No, your Honor.

12          THE COURT:  I will sign the order and give it to my

13  clerk to docket.

14          The terms of supervised release to follow imprisonment

15  are, first, the mandatory conditions of the defendant not

16  commit any other federal, state, or local crime; that he not

17  unlawfully possess a controlled substance; and that he

18  cooperate in the collection of DNA.  The drug testing

19  condition, however, is suspended based on the Court's

20  determination that the defendant poses a low risk of future

21  substance abuse.

22          There will also be imposed the standard conditions of

23  supervision 1 through 13.  They appear on the face of the

24  judgment and will be gone over with the defendant by the

25  probation officer when he reports to begin his period of

I8DHJohS

1    supervised release.

2              Finally, with respect to restitution, in that order, I

3    may not have read it, I didn't see anything about -- let me

4    take a look at that order one more time.  Thank you.

5              Yes, about how it's to be paid.  It's to be paid at

6    the rate of 15 percent of the defendant's gross monthly income

7    beginning with the second month of supervised release.

8              Finally, there are the special conditions that the

9    defendant will not incur new credit charges or open additional

10   lines of credit without the express prior approval of the

11   probation officer unless he is in compliance with the

12   installment payment schedule.  Secondly, that he must provide

13   the probation officer with access to any requested financial

14   information.  And, finally, that he must report within 72 hours

15   of his release from prison to the nearest probation office to

16   begin his period of supervised release, and he will be

17   supervised by the district of his residence.

18             Now, before we talk about the right of appeal, let me

19   first find out, is there anything further from the government?

20             MS. KEARNEY:  Just to confirm, your Honor, in

21   Mr. Johnson's plea proceeding you entered the preliminary

22   consent order of forfeiture.  Just wanted to note that remains

23   part of the sentence?

24             THE COURT:  Yes, that remains in place.

25             MS. KIRSHNER:  I think there were underlying counts.

I8DHJohS

1          MS. KEARNEY:  Yes.  If your Honor's amenable, now the

2     government will move to dismiss the open counts on the

3     indictment.

4          THE COURT:  Yes.  My courtroom deputy was waiting for

5     that.

6          MS. KIRSHNER:  Your Honor, one final request.  If the

7     Court could recommend to the Bureau of Prisons that Mr. Johnson

8     be designated to the camp at Fort Dix, we would be most

9     appreciative.

10          THE COURT:  I will certainly recommend that.  I think

11     he would be a fine candidate for that location.  Of course, I'm

12     sure you've told Mr. Johnson I cannot order that.  I can only

13     recommend it, but I will certainly recommend it.

14          Let's set a surrender date.

15          THE DEPUTY CLERK:  Six weeks?

16          THE COURT:  Yes.

17          THE CLERK:  That would make it Monday, September 24,

18     before 2:00.

19          THE COURT:  Monday, September 24, before 2 p.m.

20          MS. KIRSHNER:  Obviously, if we haven't heard from the

21     marshal service, he has a designation, we'll let you know.

22          THE COURT:  You'll let me know.

23          THE DEPUTY CLERK:  I'm sorry.  Ms. Kirshner, I didn't

24     hear what you said after camp at Fort Dix.

25          MS. KIRSHNER:  I make a recommendation --

I8DHJohS

1                    THE COURT:  Camp at Fort Dix, New Jersey.

2                    All right.  Mr. Johnson, you have a right to appeal

3      this sentence.  Do you understand that?

4                    THE DEFENDANT:  Yes, sir.

5                    THE COURT:  If you can't afford counsel for the

6      appeal, the Court will appoint one for you free of charge.

7                    Do you understand that?

8                    THE DEFENDANT:  Yes, sir.

9                    THE COURT:  Very good.

10                   (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25